UNITED STATES DISTRICT COURT FOR THE DISTRICT OF RHODE ISLAND

**Norma McDonald**, and
**Kevin McDonald**,

Plaintiffs,

vs.

**Tourbillon Trailer Sales, Inc.**, and
**M&T Credit Corporation**,

Defendants.

05 121S

---

## Introduction

1. This lawsuit involves the alleged failure of Tourbillon Trailer Sales, Inc., to honor its agreement to deliver a custom built trailer to Norma McDonald and Kevin McDonald after accepting the McDonald's $83,714.10 for it.

## Parties/Jurisdiction/Venue

2. At all pertinent times, the Plaintiff Norma McDonald (Norma) was and remains an individual domiciled in Stratford, Connecticut.

3. At all pertinent times, the Plaintiff Kevin McDonald (Kevin) was and remains an individual domiciled in Stratford, Connecticut.

4. At all pertinent times, Defendant Tourbillon Trailer Sales, Inc., (Tourbillon) was and remains a corporation incorporated under the laws of the state of Rhode Island, with its principal place of business in Scituate, Rhode Island.

5. At all pertinent times, Defendant M&T Credit Corporation (M&T) was and remains a corporation incorporated under the laws of the state of New York, with its principal place of business in Buffalo, New York, and with no place of business in Rhode Island.

6. The amount in controversy in this matter exceeds $75,000.

7. This Court has diversity jurisdiction over this litigation pursuant to 28 U.S.C. § 1332.

8. Venue is properly in this district pursuant to 28 U.S.C. § 1391

**Factual Allegations Common To All Counts**

9. Tourbillon is a merchant with respect to trailers that contain both living quarters and a separate space for horses.

10. Trailers that contain both living quarters and a separate space for horses are consumer products normally used for personal, family or household purposes.

11. In or about the winter of 2004, Kevin informed Tourbillon that he was shopping for a trailer that would contain both living quarters and a separate space for horses.

12. In and about March 2004, Kevin negotiated with Tourbillon to purchase a custom built trailer that would contain both living quarters and a separate space for horses.

13. Kevin informed Tourbillon that he was partially disabled and that he often relied on an electric scooter to get around.

14. Kevin and Tourbillon discussed ways the Trailer could be built to accommodate his partial disability.

15. Kevin informed Tourbillon that he operated a photography business which involved he and his assistant(s) traveling to horse shows, photographing horses, producing prints of the photographs onsite and selling the prints to people attending the horse shows.

16. Kevin and Tourbillon discussed ways the Trailer could be built to accommodate his personal and business needs.

17. In or about March 2004, Kevin and Tourbillon reached an agreement regarding the essential characteristics of a trailer Kevin would purchase from Tourbillon. It was agreed the trailer would be custom built for Kevin. (Hereinafter that custom trailer is referred to as the "Trailer.")

18. In or about April 2004, Tourbillon accepted $ 1,000 from Kevin as a deposit on the Trailer Kevin agreed to purchase from Tourbillon.

19. On or before May 10, 2004, Tourbillon warranted that the Trailer would include the specifications and features Kevin had requested to accommodate his partial disability.

20. On or before May 10, 2004, Tourbillon warranted that the Trailer would include the specifications and features Kevin had requested to accommodate his personal and business purposes.

21. On or before May 10, 2004, Tourbillon warranted that the trailer would be constructed in a good and workmanlike manner.

22. On or before May 10, 2004, Kevin and Tourbillon reached an agreement regarding the specifications and features for the Trailer and when Tourbillon would deliver the Trailer.

23. The agreement Kevin and Tourbillon reached regarding the specifications and features to be included in the Trailer on or before May 10, 2004, was memorialized in writing(s).

24. On or before May 10, 2004, Kevin and Tourbillon reached an agreement regarding the price of the Trailer.

25. The agreement Kevin and Tourbillon reached regarding the price and of the Trailer on or before May 10, 2004, was memorialized in writing(s).

26. On or before May 10, 2004, Tourbillon agreed that rather than selling the Trailer to Kevin, it would sell the Trailer to his mother, Norma.

27. On or before May 10, 2004, Tourbillon accepted $2,500 from Norma to be applied towards the purchase price of the Trailer.

28. On or before May 10, 2004, Norma agreed to purchase the Trailer from Tourbillon and Tourbillon agreed to sell it to her, at the price, with the specifications and features, and with the warranties, Tourbillon had previously agreed to with Kevin.

29. The warranties and representations Tourbillon made, which are specified in the paragraphs above, formed part of the basis of the agreement between Tourbillon and Kevin and Norma.

30. On or about May 10, 2004, Norma entered into and signed a retail installment sales contract (RISC) with Tourbillon for the purchase of the Trailer.

31. The RISC listed the cash price of the Trailer as $79,459.10, listed $1,755 in additional charges for the transaction, listed only a $1,000 down payment, and listed the amount financed as $80,214.10.

32. Tourbillon subsequently assigned the contract to M&T which is the current holder of the contract.

33. On or about May 10, 2004, Tourbillon received the balance it was owed for the Trailer.

34. On or about August 6, 2004, Tourbillon presented Kevin and Norma with a trailer it purported to be the custom built Trailer Kevin and Norma had paid for.

35. The trailer Tourbillon presented to Kevin and Norma was manufactured after July 4, 1975.

36. The Trailer Tourbillon presented to Kevin and Norma did not include many of the substantial, and less substantial, specifications and features Tourbillon had promised Kevin and Norma.

37. The trailer Tourbillon presented to Kevin and Norma on or about August 6, 2004 contained, among others, the following deficiencies and nonconformities in violation of Tourbillon's agreement with Kevin and Norma:

   a. The height was approximately 1 foot too short;
   b. The shower stall was too short for Kevin to use standing straight up;
   c. The bed was practically useless for adults because there was so little space between the top surface of the bed and the ceiling;
   d. The heating, ventilation and air condition system was inadequate;

e. The toilet was placed too close to the wall so adults would have to sit on the toilet sideways;

f. Part of the bathroom floor was carpeted instead of covered in vinyl;

g. A built-in microwave oven was present but it was only ½ the agreed upon size;

h. There was no built-in coffee maker;

i. The agreed upon countertops were not installed;

j. An extra outside step was not installed;

k. Steel 'diamond plate' was missing from the exterior battery box and from under the gooseneck portion of the trailer;

l. The stovetop protruded through the surrounding countertop instead of being flush with it;

m. An exterior light under the gooseneck was missing;

n. The storage space under the custom ordered couch was removed;

o. There was no privacy curtain for the bed;

p. A closet was missing;

q. Certain rear cargo lights were missing;

r. The bathroom walls were chipped;

s. The side of the bathroom sink was scratched;

t. An electrical outlet by the slide-out section of the trailer was unusable;

u. The slide-out section of the trailer was not finished properly;

v. Various light switches and electrical plugs were cracked;

w. Various electric switches were installed the wrong way;

x. Cabinet doors and cabinet faces were crooked;

y. The draws had no latches;

z. The valances over the door and over the sink were cracked;

aa. A 'transition plate' which would have allowed Kevin to drive his electric scooter in and out of the trailer was missing;

38. Kevin and Norma rejected the trailer Tourbillon presented to them.

39. In the alternative, Kevin and Norma revoked their acceptance of the Trailer in a timely manner.

40. Tourbillon never presented Kevin or Norma with a trailer that met the specifications of the one they had paid for.

41. From August 2004 into the winter of 2005, Kevin and Norma repeatedly notified M&T of their rejection of the Trailer, or in the alternative, their timely revocation of their acceptance of the Trailer

42. As a direct and proximate result of Tourbillon's failure to deliver the Trailer Kevin and Norma paid it for, Kevin and Norma suffered damages in excess of $75,000.

**Count 1 – Cancellation of Contract and Breach of Contract**

43. Count I is an action against both defendants pursuant to the Rhode Island Uniform Commercial Code as codified at RIGL 6A-2-601 or, in the alternative, RIGL 6A-2-608, to cancel the contract between the McDonalds and Tourbillon due to Tourbillon's breach of express and implied warranties, breach of contract, and for incidental and consequential damages.

44. The Plaintiffs reassert the facts and allegations contained in all the previous paragraphs and incorporate them into this Count.

**A. Breach of Express Warranties**

45. Tourbillon warranted to Kevin and Norma that it would deliver to them a trailer, custom built in a good and workmanlike manner, with certain features and specifications.

46. Tourbillon warranted to Kevin and Norma that it would deliver the custom built trailer before July 26, 2004.

47. Tourbillon contracted with Kevin and Norma to deliver to them a trailer, custom built in a good and workmanlike manner, with certain features and specifications, before July 26, 2004.

48. Kevin and Norma performed their obligations under their contract with Tourbillon contract by paying Tourbillon the agreed upon price for the Trailer.

49. Tourbillon failed to deliver, produce or tender a trailer, built in a good and workmanlike manner, with the agreed upon features and specifications.

50. In the alternative, Kevin and Norma, in a timely manner, revoked their acceptance of the trailer Tourbillon tendered.

51. Tourbillon failed to deliver, produce, or tender any trailer until after July 26, 2004.

52. Tourbillon's failures violated the express warranties it had given Kevin and Norma.

53. Tourbillon's failures constituted a breach of its contract with Kevin and Norma.

54. Tourbillon's breach of its contract with Kevin and Norma was unjustifiable within the meaning of Rhode Island General Law 9-1-45.

55. As a result of Tourbillon's breach of its contract and breach of express warranties with Kevin and Norma, they (the Plaintiffs) have suffered direct, consequential and incidental damages.

**B. Breach of Implied Warranty of Fitness For a Particular Use**

56. On or about May 10, 2004, Kevin and Norma paid Tourbillon for a Trailer.

57. Kevin and Norma paid for the Trailer for the particular purpose of having a trailer Kevin could use independently even though he is partially disabled.

58. Kevin and Norma paid for the Trailer for the particular purpose of having a trailer Kevin could use for both for his personal purposes and for his photography business.

59. Kevin and Norma informed Tourbillon before they paid for the Trailer of the particular purposes for which they were purchasing the Trailer.

60. Kevin and Norma relied on Tourbillon's skill and/or judgment to produce a suitable Trailer and Tourbillon knew Kevin and Norma were relying on it.

61. An implied warranty arose that the Trailer would be fit for Kevin's and Norma's particular purposes.

62. The trailer Tourbillon presented to Kevin and Norma was not fit for Kevin's and Norma's particular purposes in that its defects and nonconformities included, among other things, an unusable bed, a countertop obstructed by a protruding stovetop, inadequate outside steps, inadequate storage, and no 'transition plate' which would have allowed Kevin to drive his electric scooter in and out of it.

63. Kevin and Norma notified Tourbillon of the defects and nonconformities in the trailer in a timely manner.

64. As a result of Tourbillon's breach of the implied warranty of fitness for a particular use, Kevin and Norma have suffered direct, consequential and incidental damages.

**C – Rejection**

65. The Plaintiffs rightfully and effectively rejected the Trailer in August 2004, or in the alternative, in their subsequent communications with Tourbillon and M&T.

**D – Revocation of Acceptance**

66. The Plaintiffs assert revocation of acceptance as an alternate basis for cancellation of the contract, in addition to rejection.

67. The nonconformities and defects in the Trailer resulting from the breach of warranties described in the proceeding paragraphs substantially impaired the value of the Trailer to the Plaintiffs.

**E. Breach of Duty of Good Faith**

68. Tourbillon breached its duty of good faith, implied in its transaction with the Plaintiffs by the Rhode Island Uniform Commercial Code as codified at RIGL 6A-1-203, by, among other things:

    a. breaching the express and implied warranties described in the proceeding paragraphs;

    b. attempting to force the Plaintiff to accept the trailer knowing of its nonconforming and defective condition; and

c. treating the Plaintiffs in a disrespectful manner.

69. As a result of Tourbillon's breach of its duty of good faith, the Plaintiffs have suffered direct, consequential and incidental damages.

**F. Liability of Assignee M&T**

70. A copy of the retail installment sales contract (RISC) between Tourbillon and the Plaintiffs, as provided by M&T, is attached as Exhibit A.

71. The RISC is a consumer credit contract.

72. The Defendant M&T is liable for all claims and defenses which the Plaintiffs have against Tourbillon.

**WHEREFORE, the Plaintiffs request this Court:**

a) Declare the RISC involved herein is cancelled;

b) Declare the remainder of the contract obligation under the RISC void and unenforceable;

c) Award them a monetary judgment against Tourbillon and M&T sufficient to compensate them (the Plaintiffs) for their direct, consequential and incidental damages;

d) Award them attorney fees, litigation costs, and expenses;

e) If appropriate after the facts are more fully developed, award them punitive damages;

f) Grant them such other relief as may be just and appropriate;

g) Grant them a trial by jury on this Count, and all counts for which one is available under the law.

**Count II – Damages for Breach of Warranty**

73. Count II is brought in the alternative to Count I in the event the Plaintiffs' rejection and/or revocation is not given effect, and is brought pursuant to the Rhode Island Uniform Commercial Code as codified at RIGL 6A-2-714 and RIGL 6A-2-715.

74. The Plaintiffs reassert the facts and allegations contained in all the previous paragraphs and incorporate them into this Count.

75. As a result of Tourbillon and M&T's conduct described in this Complaint the Plaintiffs have suffered actual, incidental and consequential damages.

**WHEREFORE, the Plaintiffs request this Court:**

a) Declare the RISC involved herein is cancelled;

b) Declare the remainder of the contract obligation under the RISC void and unenforceable;

c) Award them a monetary judgment against Tourbillon and M&T sufficient to compensate them (the Plaintiffs) for their direct, consequential and incidental damages;

d) Award them attorney fees, litigation costs, and expenses;

e) If appropriate after the facts are more fully developed, award them punitive damages;

f) Grant them such other relief as may be just and appropriate;

g) Grant them a trial by jury on this Count, and all counts for which one is available under the law.

Norma McDonald,
Kevin McDonald,
by their Attorney,

John T. Longo, Esq./#4928
681 Smith Street, Suite 201
Providence, RI 02908
(401) 272-2177
Fax (401) 274-5433
jtlongo@yahoo.com

CSW2991733

RETAIL INSTALLMENT CONTRACT — NON NEGOTIABLE CONSUMER NOTE

FORM RIS12SLC-1 (Rev. 4/01)

# M&T CREDIT CORPORATION

5/20 KM2

SIMPLE INTEREST
RHODE ISLAND (CONSUMER GOODS)

Dated 5/10/2004

Y1100010311758CCC

Account # 1181300250

| ANNUAL PERCENTAGE RATE The cost of your credit as a yearly rate | FINANCE CHARGE The dollar amount the credit will cost you. | Amount Financed The amount of credit provided to you or on your behalf. | Total of Payments The amount you will have paid after you have made all scheduled payments. | Total Sale Price The total cost of your purchase on credit, including your downpayment of $ 1000.00 |
|---|---|---|---|---|
| 7.95 % | $81255.50 | $ 80214.10 | $ 161469.60 | $ 162469.60 |

Your Payment Schedule will be:

| No. of Payments | Amount of Payments | When Payments Are Due |
|---|---|---|
| 240 | $672.79 | in 45 days Monthly, beginning 6/24/2004 |
| | $ | Ending 5/24/2024 |

Filing Fees: $ N/A

**Security:** You are giving a security interest in the goods or property being purchased.

**Late Charge:** If a payment is more than 10 days late, you will be charged 5% of the full payment amount, but not more than $10.00

**Prepayment:** If you pay off early, you may have to pay a penalty

See below and any other Contract documents for any additional information about nonpayment, default, any required repayment in full before the scheduled date and prepayment refunds and penalties.

e means estimate

In this Security Agreement ("Contract"), we are the SELLER: Tourbillon Trailer Sales, Inc. 481 Snake Hill Road, North Scituate, RI 02857
Name Address Zip Code

This Contract is between Seller and Buyer. All disclosures have been made by Seller. Seller intends to assign this Contract to the Assignee.

You are the BUYER(S): Norma C McDonald 60 Prayer Spring Road, Stratford, CT 06614
Name(s) Address(es) County(ies) Zip Code(s)

You signed this Contract in PROVIDENCE County, Rhode Island.

If there is more than one Buyer, each promises, separately and together, to pay all sums due us and to perform all agreements in this Contract.

GOODS: Under the terms of this Contract, you have agreed to purchase the following described property and services, which are called "Goods and Services" or "Goods" in this Contract.

| N/U/D | Description | Model Number | Serial Number | Price | Sales Tax | Cash Price |
|---|---|---|---|---|---|---|
| N | 34 SLA/LQ | 2004 Hawk | 1H9VT3526[illegible]283732 | 73029.00 | $4430.10 | 79459.10 |
| | | | | $ | $ | $ |
| | | | | $ | $ | $ |
| | | | | | Total | 78365.10 |

| Cash Price, Downpayment and Trade-In | |
|---|---|
| Cash Price (including accessories, services and taxes) | $ 79459.10 |
| Cash Downpayment | $ 1000.00 |
| Value of Trade-In | $ N/A |
| Lien Payoff | $ N/A |
| Lien Payoff to | |

TRADE-IN:
You have traded in the following property:
Description

If a balance is still owing on the property you have traded in, the Seller will pay all the amount on your behalf. You warrant and represent to us that any trade-in is free from liens, claims, encumbrances or security interests, except as shown in the "Cash Price, Downpayment and Trade-In" section as the amount of the "Lien Payoff".

**PROPERTY INSURANCE** [X] If checked, you promise to insure the Goods and keep them insured. You may choose the person through whom you obtain this insurance.

**VENDOR'S SINGLE INTEREST INSURANCE** [X] If box is checked, we require Vendor's Single Interest Insurance. You may choose the person through whom Vendor's Single Interest insurance is to be obtained. This insurance is for the sole protection of the Assignee and your interest is not covered. If obtained through us, the cost of such insurance is shown in "C" "Itemization of Amount Financed" in the box labeled "To VSI Insurance Company**".

**ANY INSURANCE INCLUDED IN THIS RETAIL SALE INSTALLMENT CONTRACT DOES NOT PROVIDE COVERAGE FOR PERSONAL LIABILITY AND PROPERTY DAMAGE CAUSED TO OTHERS.**

**CREDIT INSURANCE IS NOT REQUIRED:** Credit Life Insurance, Credit Disability Insurance and Credit Involuntary Unemployment Insurance are not required to obtain credit and will not be provided unless you sign below and agree to pay the additional cost(s). Please read the NOTICE OF PROPOSED CREDIT INSURANCE on the reverse side. Your insurance certificate or policy will tell you the MAXIMUM amount of insurance available. All insurance are based on the for the term of the credit.

By signing, you select Single Credit Life Insurance, which costs $ N/A What is your age? ____ Yrs.

Signature of Buyer to be insured for Single Credit Life Insurance

Insurer:

By signing, you select Single Credit Disability Insurance, which costs $ N/A What is your age? ____ Yrs.

Signature of Buyer to be insured for Single Credit Disability Insurance

Insurer:

| Itemization of Amount Financed | |
|---|---|
| Unpaid Cash Price Balance | $ 78459.10 |
| Amounts Paid to Others on Your Behalf | |
| License, Tags and Registration | $ 100.00 |
| Lien Fees | $ N/A |
| To Credit Insurance Company | $ N/A |
| To VSI Insurance Company** | $ 35.00 |
| To Property Insurance Company | $ N/A |
| To GAP Insurance Company | $ N/A |
| Extended Svc. Contract | $ 1495.00 |
| DOCUMENTATION FEE | $ 125.00 |
| Other Amounts Financed | |
| To Seller for GAP Coverage | $ N/A |
| For | |

Exhibit A
Complaint
McDonald v Tourbillon and M&T Credit

Insurer

By signing, you select Single Credit Involuntary Unemployment Insurance, which costs $ N/A

What is your age? ____ Yrs.

X

Signature of Buyer to be insured for Single Credit Involuntary Unemployment Insurance

Insured: N/A

Insurer: N/A

By signing, you both select Joint Credit Involuntary Unemployment Insurance which costs $ N/A

What are your ages? Percentage to be insured

1. X

2. X

Signatures of both Buyers to be insured for Joint Credit Involuntary Unemployment Insurance

Insurer: N/A

**DEBT CANCELLATION COVERAGE IS NOT REQUIRED:** Debt Cancellation Coverage provides for the cancellation of your liability for amounts you owe under this Contract, in excess of the value of the Goods in the event of a total loss of the Goods. This is sometimes called "GAP" coverage. GAP coverage is not required to obtain credit and will not be provided unless it is offered and you sign a separate GAP Notice requesting GAP coverage. If offered, and if you obtain GAP coverage in connection with this Contract, you agree to pay the additional cost disclosed in the "Itemization of Amount Financed".

**ASSIGNEE:** We intend to assign this Contract and Security Agreement to the Assignee named in this provision. If the Assignee assigns the Contract to a subsequent assignee, the term also refers to such subsequent assignee. After the assignment, all rights and benefits of the Seller in this Contract and in the Security Agreement shall belong to and be enforceable by the Assignee.

The Assignee's name and address is:

**M&T CREDIT CORPORATION**
**Installment Loan Operations, One Fountain Plaza, P.O. Box 4005**
**Buffalo, New York 14240**

**CO-OWNER:** Any person signing the Co-Owner's Security Agreement below gives us a security interest in the Goods and agrees separately and together with all Co-Owner(s) and Buyer(s) to perform all agreements in the Security Agreement and all other parts of this Contract except the "Promise to Pay" section.

**TERMS:** The terms shown in the boxes above are part of this Contract.

**PROMISE TO PAY:** You agree to pay us the Total Sale Price for the Goods and Services by making the Cash Downpayment, assigning the trade-in, if any, and paying us the Amount Financed plus interest at the Annual Percentage Rate shown above. You promise to make the payments in accordance with the Payment Schedule. You promise to make payments on or before the same day each month as the first payment due date. You agree to pay our reasonable attorneys' fees and costs if we prevail in any legal action on this Contract, if permitted by law. You agree to make payments at the place or to send payments to the address which the Assignee most recently specified by written notice to you.

**SECURITY AGREEMENT:** To secure the payment of all sums due and the performance of all required obligations under this Contract, you give us a security interest in the Goods, in all parts ("called accessions") attached to the Goods at any later time, and in any proceeds of the Goods, including insurance proceeds. "Proceeds" means money or other property received when the Goods are sold, traded or disposed of in any way, including money paid on account of the Goods by an insurance company. The Assignee may set off any amount due and unpaid under this Contract against any of your money on deposit with Assignee. This includes any money which is now or may in the future be deposited with Assignee by you or for your benefit.

**ADDITIONAL TERMS AND CONDITIONS:** THIS CONTRACT CONTINUES ON THE REVERSE SIDE. YOU ARE OBLIGATED TO ALL THE TERMS OF THE CONTRACT WHICH APPEAR ON THE FRONT AND REVERSE SIDES.

By signing below, we agree to sell the Goods to you under the terms of this Contract.

SELLER Tourbillion Trailer Sales, Inc.

BY X [signature] 5/10/2004
Date

**NOTICE TO BUYER: 1. Do not sign this Contract before you read it or if it contains any blank space. 2. You are entitled to a completely filled-in copy of this Contract when you sign it. 3. Under the law, you have the following rights, among others: (a) to pay off in advance the full amount due and obtain a refund of any unearned Finance Charge; (b) to redeem the property if repossessed for a default; (c) to require, under certain conditions, a resale of the property if repossessed.**

**RETAIL INSTALMENT CONTRACT**

BUYER X [signature] 5/10/2004
Date

BUYER X 5/10/2004
Date

**CO-SIGNER: YOU SHOULD READ THE NOTICE TO CO-SIGNER, WHICH HAS BEEN GIVEN TO YOU ON A SEPARATE FORM, BEFORE SIGNING THE CO-SIGNER'S AGREEMENT.**

**CO-SIGNER'S AGREEMENT:** You, the person (or persons) signing below as "Co-Signer", promise to pay to us all sums due on this Contract and to perform all agreements in this Contract. You intend to be legally bound by all the terms of this Contract, separately and together with the Buyer. You are making this promise to induce us to make this Contract with the Buyer, even though we will use the proceeds only for the Buyer's benefit. You agree to pay even though we may not have made any prior demand for payment on the Buyer or exercised our security interest. You also acknowledge receiving a completed copy of this Contract.

X
Co-Signer's Signature — Address — Date

X
Co-Signer's Signature — Address — Date

**CO-OWNER'S SECURITY AGREEMENT:** You, the person signing below as "Co-Owner", together with the Buyer(s) being all of the Owners of the Goods, give us a security interest in the Goods identified above. You agree to be bound by the terms of the Security Agreement and all other parts of this Contract except the "Promise To Pay" section. You are giving us the security interest to induce us to make this Contract with the Buyer, and to secure the payment by the Buyer of all sums due on this Contract. You will not be responsible for any deficiency which might be due after repossession and sale of the Goods. You also acknowledge receiving a completed copy of this Contract.

X
Co-Owner's Signature — Address — Date

**ASSIGNMENT**

The Seller agrees to be bound by all provisions of this Contract. Also, for value received and intending to be legally bound hereby, the Seller (a) assigns this Contract to the Assignee pursuant to and subject to all terms and conditions of the dealer agreement currently in effect between Seller and Assignee and (b) makes, with respect to this Contract, all warranties and representations set forth in such dealer agreement. Whether or not Seller signs this Assignment, and if Assignee takes assignment of the Contract from the Seller, then such assignment shall be deemed to be "without recourse", pursuant to the dealer agreement, and made as of the date of the Contract. For purposes of this Assignment, Seller hereby appoints Assignee as its attorney-in-fact to supply any missing signature of Seller hereunder.

____ 2004 — Tourbillion Trailer Sales, Inc. — [signature]
Date — Name of Seller — Signature and Title of Person signing for Seller

**M&T Bank**

03/08/05

NORMA C MCDONALD
60 PRAYER SPRING RD
STAFFORD CT 06614

Dear NORMA C MCDONALD

Thank you for calling Customer Service. We have enclosed the item(s) you requested.

If you have any questions, please call our Customer Service Department at (716) 626-1900 or 1-800-724-2440 outside the Buffalo calling area.

Thank you for banking with M&T.

Sincerely,

Michele Cole-Hector

Michele Cole-Hector
Customer Service